IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS OSWALD, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PACIFIC LIFE INSURANCE COMPANY | : | |
| | : | NO.  25-2318 |

**MEMORANDUM**

**Padova, J.**                                                                                            **April 22, 2026**

Plaintiffs Louis Oswald, Patricia Oswald, and the Louis E. Oswald and Patricia M. Oswald Irrevocable Survivor Life Insurance Trust U/A/D August 10, 1997 (the "Oswald Trust") commenced this declaratory judgment action against Defendant Pacific Life Insurance Company, seeking declarations that, inter alia, a life insurance policy that they purchased from Defendant will remain in effect until August 15, 2042, without any additional payment of premiums.  After engaging in limited discovery, Plaintiffs have filed a Motion for Leave to File a Second Amended Complaint, seeking to add a claim for anticipatory breach of contract, three fraud claims, a negligence claim, a claim under the Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), 73 Pa. Stat. Ann. § 201-1 et seq., and a bad faith claim under 42 Pa. Cons. Stat. § 8371.  Defendant opposes the Motion.  For the reasons that follow, we grant in part and deny in part Plaintiffs' Motion.

## I.    BACKGROUND

The currently operative Amended Complaint, which was filed on May 28, 2025, alleges that, on May 12, 1997, Defendant's authorized representative and independent agent, Edward L. Flank, sold to Plaintiffs Life Insurance Policy No. 1A2324962-0 (the "Policy").  (Am. Compl. ¶ 3.)  Flank told Plaintiffs when he sold them the Policy that, "at some point during the Policy's term," the paid-in premiums would be sufficient to fund the Policy through its end date, which was

August 15, 2042, and Plaintiffs would no longer be required to pay premiums. (Id. ¶ 6.) Indeed, after sixteen years of staying current on their premium payments, in 2013, Flank told the Oswalds that the value of paid-in premiums and interest was sufficient to fund the Policy until August 15, 2042. (Id. ¶ 21.) In reliance on that information, Plaintiffs stopped paying premiums. (Id. ¶ 22.) Thereafter, Plaintiffs received periodic reports from Defendant that reflected the August 15, 2042 end date. (Id. ¶ 24.) Recently, however, Defendant forwarded to Plaintiffs "new schedules and projections . . . , which . . . appear to reflect termination of the Policy before the August 15, 2042 End Date." (Id. ¶ 25.) Defendant has not advised Plaintiffs what they can do "to preserve the August 15, 2042 End Date consistent with the original terms under which the Policy was purchased, or the advice of Flank." (Id. ¶ 28.)

The Amended Complaint seeks only a declaratory judgment that includes the following four Declarations:

1. That the End Date for [the Policy] is and remains August 15, 2042.
2. That [the Policy] will remain in full force and effect until August 15, 2042, without payment of any additional premiums . . . .
3. That [the Policy] may not be cancelled or terminated prior to the August 15, 2042 end date.
4. Plaintiffs are entitled to full coverage under [the Policy], and full death benefits, until the August 15, 2042 end date.

(Id. at 6 of 8.)

Defendant moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the declaratory relief that Plaintiff requests is based on oral representations by Flank that are contrary to the terms of the written insurance Policy. In support of its argument, Defendant attached the policy pages for the Policy, as well as a specimen policy, which it contended contains identical language to that of the Policy. On September 10, 2025, we denied that Motion to Dismiss, refusing to consider the specimen policy in connection with the

Motion because it was not undisputedly authentic.  On September 17, 2025, we issued a scheduling order, imposing a discovery deadline of  December 15, 2025.  Plaintiffs filed their Motion for Leave to File a Second Amended Complaint on October 31, 2025.

The proposed Second Amended Complaint (the "SAC") greatly expands on both the factual allegations and the claims in the Amended Complaint.  Whereas the Amended Complaint contains thirty-two paragraphs of factual allegations, the proposed SAC contains more than 150 such paragraphs.  And while the Amended Complaint contains a single declaratory judgment count, the proposed SAC contains eight counts—for declaratory judgment, anticipatory breach of contract, fraud, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, violation of the UTPCPL, and statutory bad faith.

Among the new factual allegations are the following.  The Owner of the Policy is the Oswald Trust, while Louis and Patricia Oswald are the actual purchasers and the named Insureds. (SAC ¶¶ 7-8.)  In purchasing the Policy, Plaintiffs relied on Flank's representations that "at some point well in advance of" the August 15, 2042 Policy End Date, the annual out-of-pocket premiums would be "paid in full," and he would advise them that no further out-of-pocket premiums would be necessary to keep the Policy in force because the Policy would then be "self-funded."  (Id. ¶ 12.)  For sixteen years, Plaintiffs paid annual premiums of $21,270.00.  (Id. ¶¶ 16-17.)  In a 2013 phone call between Mr. Oswald and Flank, Flank told Mr. Oswald that after the 2013 premium payment, no further payments would be necessary because the Accumulated Value of the Policy, made up of paid-in premiums and investment returns, would be sufficient to fund the Policy until the 2024 end date.  (Id. ¶¶ 20-21.)  Mr. Oswald made his final payment in August of 2013.  (Id. ¶ 22.)  Although Mr. Oswald subsequently received from Defendant an "annual payment reminder," Flank told him that he could ignore that reminder.  (Id. ¶¶ 23-25.)  For a decade, annual reports

that Mr. Oswald received from Defendant reflected the August 15, 2042 End Date. (Id. ¶¶ 28-29, 33.)

In the Fall of 2022, Mr. Oswald instructed his estate counsel, Stacey Willits McConnell, to take steps to become the sole Trustee of the Oswald Trust and then to reach out to Defendant to update the Trustee in its records. (Id. ¶¶ 34-35.) Ms. McConnell sent letters to Defendant in September and October of 2022, but received no response. (Id. ¶ 36.) On August 7, 2023, Mr. Oswald asked Ms. McConnell and her partner, James Sargent, to inquire about the Policy because he had no current information as to its status. (Id. ¶ 37.) Ms. McConnell sent a letter to Defendant on August 11, 2023, "to which she received no meaningful response." (Id. ¶ 38.) On October 18, 2023, Mr. Sargent sent an "Other Interested Party Authorization Request" to Defendant. (Id. ¶ 39.) On November 15, 2023, Defendant advised Ms. McConnell that it could not grant her earlier request to be recognized as Trustee or Mr. Sargent's request for information until the Trustees were updated in Defendant's file system. (Id. ¶ 40.)

On January 10, 2024, Ms. McConnell provided Defendant with the necessary information to be designated the Trustee, and Defendant confirmed Ms. McConnell as the sole Trustee of the Oswald Trust. (Id. ¶ 41.) That same day, Francheszka Coleman, a customer service representative at Defendant, sent Mr. Sargent an "Illustration" relating to the Policy along with the 2023 Annual Statement. (Id. ¶¶ 42-43.) The Illustration revealed that "Insurance coverage will cease in year 29 [2026] based on guaranteed assumptions" and that "Insurance coverage will cease in year 35 [2032] based on illustrated assumptions." (Id. ¶ 45 (alterations in original).) On February 13, 2024, Mr. Sargent emailed Ms. Coleman to ask why the Policy value was eroding at the rate of $6,000 per year, and was projected to erode by as much as $80,000, in the final year. (Id. ¶ 46.) Mr. Sargent received an automated response directing him to either contact customer service or

4

refer to Defendant's website. (Id. ¶ 47.) Mr. Sargent tried to contact Ms. Coleman again on April 11, 2024, but again received an automated response. (Id. ¶ 48.) In June of 2024, Mr. Oswald's son-in-law, Steven Durante, connected with Scott Lowe, an employee of Defendant, by email. (Id. ¶¶ 49-51.) That summer, Mr. Durante, Mr. Oswald, and Mr. Sargent exchanged emails with various employees of Defendant, seeking to get a copy of the Policy as well as additional information about the Policy. (Id. ¶ 52.) On June 18, 2024, the three received additional Illustrations, but not a copy of the Policy and, on August 13, 2024, a representative of Defendant informed Mr. Durante that they "were not able to produce a duplicate policy for this product." (Id. ¶¶ 53, 55.)

On August 14, 2024, Mr. Sargent and Ms. McConnell received a "Planned Payment Reminder." (Id. ¶ 56.) Between August and December of that year, Mr. Oswald and Mr. Sargent "became increasingly concerned about the status of the Policy." (Id. ¶ 58.) On January 7, 2025, Plaintiffs instituted suit in state court, seeking a declaratory judgment that the Policy was a self-funding "vanishing premium" Policy and would remain in effect until 2042.[1] (Id. ¶ 59.) Thereafter, Defendant removed the action to this Court, and the parties engaged in discovery and settlement negotiations. (Id. ¶ 60.) In August of 2025, Defendant forwarded new Illustrations and projections reflecting that the Policy may terminate before August 15, 2042. (Id. ¶ 61.) The "Guaranteed Assumptions" suggest that the Policy could lapse as early as 2027. (Id. ¶ 62.) The

---

[1] A "vanishing premium" policy is one in which "the policyholder pays higher-than-normal premiums in the early years of the policy," which enables "a higher fraction of premium dollars [to be] distributed into the policy's . . . accumulation fund[], allowing the cash value of the policy to accumulate faster." Drelles v. Mfrs. Life Ins. Co., 881 A.2d 822, 828 (Pa. Super. Ct. 2005) (quoting Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1272 n.4 (11th Cir. 2005)). "The goal of a vanishing premium plan is to set premiums at a level where, after a certain number of years, enough cash value has accumulated within the policy so that future administrative and insurance costs can be paid out of the accumulation fund, with no further out-of-pocket payments by the policyholder." Id. (quoting Cotton, 402 F.3d at 1272 n.4).

Annual Report discloses that from 2016 to the present, the annual additions to the Policy (essentially, interest credits) have decreased while the annual subtractions (i.e., the sum of monthly deductions) have increased, ultimately eroding the cumulative value of the Policy. (Id. ¶¶ 64-66.) As recently as 2021, the additions to the value still exceeded the subtractions, but in the 2022-2023 statement, the difference between the additions and subtractions was -$5,886.49, thereby reducing the accumulated value of the Policy by that amount, and that difference rose to -$18,801.11 in the 2024-2025 statement. (Id. ¶¶ 66, 69.)

## II.    LEGAL STANDARD

Plaintiffs seek leave to file the SAC pursuant to Federal Rule of Civil Procedure 15. Rule 15 provides that "[a] party may amend its pleading once as a matter of course . . . ." Fed. R. Civ. P. 15(a)(1). For subsequent amendments, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts should "freely give leave" to file an amended pleading "when justice so requires." Id.

Decisions on motions for leave to amend are "committed to the sound discretion of the district court." Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 272 (3d Cir. 2001). At the same time, the United States Court of Appeals for the Third Circuit has stated that a court may only deny leave to amend when "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Wolfington v. Reconstructive Orthopaedic Assocs. II PC, 935 F.3d 187, 210 (3d Cir. 2019) (quoting United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co., 839 F.3d 242, 249 (3d Cir. 2016)). A party opposing amendment bears the burden of showing undue delay, bad faith, prejudice, or futility. Seaport Glob. Holdings, LLC v. PowerPay, LLC, Civ. A. No. 23-1422, 2025 WL 2213931, at *1 (E.D. Pa. Aug. 4, 2025) (quotation omitted).

6

## III.   DISCUSSION

Plaintiffs seek leave to amend their currently-operative Amended Complaint to assert additional claims that they contend are based on "additional information and context gleaned through litigation thus far." (Pls.' Mem. at 3.)  Defendant opposes amendment, contending both that Plaintiffs' delay in filing their Motion arises to the level of bad faith and that the proposed new claims are futile.

### A.     Undue Delay and Bad Faith

Defendant argues that we should deny Plaintiffs' Motion based on undue delay, asserting that  Plaintiffs knew or should have known all of the information on which they base their new claims "years before" they filed their initial Complaint.[2]  (Def.'s Mem. at 16.)   Notably, delay alone does not support denial of a motion for leave to amend.  Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (citing Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  Rather, we may only exercise our discretion to deny a motion to amend based on delay where the delay has become "undue." See id. (quotation omitted).  "Undue delay" occurs when the delay "plac[es] an unwarranted burden on the court." Lindquist v. Buckingham Twp., 106 F. App'x 768, 775 (3d Cir. 2004) (quoting Adams, 739 F.2d at 868).  "The question of undue delay, as well as the question

---

[2] Defendant also suggest that leave to amend may be denied because Plaintiffs are proceeding in bad faith insofar as the SAC contains "hyperbolic, and inaccurate descriptions of the facts of this case" (Def.'s Mem. at 10), as well as new claims that are "contrary to the facts and . . . sworn testimony of Plaintiff Louis Oswald" (Def.'s Sur-Reply Mem. at 5).  To establish that the allegations and claims in the SAC are not grounded in fact, Defendant submits numerous exhibits, including audio files of recorded phone calls.  At this stage of the proceedings, however, we will not consider such expansive evidence, not all of which Plaintiffs rely upon in the SAC, to make findings as to whether Plaintiffs' claims are so untethered from facts that they demonstrate bad faith.  Such an approach would be particularly problematic where we are proceeding on an incomplete record because Plaintiff's Motion was filed prior to the conclusion of discovery.  Thus, we will not further entertain Defendant's fact-intensive argument that Plaintiffs' claims and allegations are asserted in bad faith and that their Motion should be denied on that basis.

of bad faith, requires that we focus on the plaintiff's motives for not amending their complaint to assert [their] claim[s] earlier." Id. (quoting Adams, 739 F.2d at 868) (citation omitted). Nevertheless, "[a] delay of less than a year from the filing of the initial complaint to the filing of an amended complaint is rarely, if ever, sufficient to become undue." Victaulic Co., 839 F.3d at 252 (citing Arthur, 434 F.3d at 205). Indeed, "[t]he liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case." Arthur, 434 F.3d at 206 (citing Foman v. Davis, 371 U.S. 178, 182 (1962); Boileau v. Bethlehem Steel Corp., 730 F.2d 929, 938-39 (3d Cir. 1984)).

Here, the time between Plaintiffs' filing of their original Complaint in state court, in April of 2025, and their filing of their Motion for Leave to file a Second Amended Complaint in October of 2025, was just six and a half months. Moreover, Plaintiffs explain that the reason that they now seek to amend is that they have obtained additional information and documents in the course of this still-early-stage litigation, which have expanded their understanding of the issues involved and provided factual support for their new claims. Defendant takes issue with this rationale, averring that Plaintiffs had all relevant facts before they filed suit in 2025, because, inter alia, they learned in 2024 that the premiums paid before then were insufficient to fund the Policy through its end date. We conclude, however, that (1) the amount of delay at issue is simply too short to be presumptively "undue," (2) Plaintiffs' explanation as to why they are now seeking leave to amend is satisfactory, and (3) the limited delay imposes no unwarranted burden on the court. We therefore exercise our discretion to reject Defendant's argument that Plaintiffs' Motion should be denied based on undue delay.

### B.      Futility

Defendant contends that allowing amendment to add the new claims that Plaintiffs seek to assert in the SAC would be futile.  These new claims are anticipatory breach of contract, fraud, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, violation of the UTPCPL, and statutory bad faith.

Under the law in this Circuit, amendment is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted."  Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)). "In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."  Id. (citing Burlington, 114 F.3d at 1434) (add'l citation omitted).  Thus, "the district court may properly deny leave to amend [on futility grounds] where the amendment would not withstand a motion to dismiss."  Centifanti v. Nix, 865 F.2d 1422, 1431 (3d Cir. 1989) (citing Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).  We "accept[] all well-pleaded allegations in the complaint as true and view[] them in the light most favorable to the plaintiff."  Talley v. Pillai, 116 F.4th 200, 206 (3d Cir. 2024 (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)).  However, we "need not 'accept as true a legal conclusion couched as a factual allegation.'"  Host Int'l, Inc. v. MarketPlace PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (citation omitted).

9

A plaintiff's pleading obligation is to set forth "'a short and plain statement of the claim,'" which "'give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (second alteration in original) (first quoting Fed. R. Civ. P. 8(a)(2); then quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  Under this standard, a complaint need not plead all of the facts necessary to prove each element of the plaintiff's claims; it "need only allege enough facts to 'raise a reasonable expectation that discovery will reveal evidence of [each] necessary element.'" Martinez v. UPMC Susquehanna, 986 F.3d 261, 266 (3d Cir. 2021) (alteration in original) (quoting Fowler, 578 F.3d at 213).  In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555).

### 1.    Anticipatory Breach of Contract

Defendant argues that it would be futile to allow Plaintiffs to assert an anticipatory breach of contract claim because the SAC does not plausibly allege the necessary elements of that claim. To state a cognizable claim for anticipatory breach of contract under Pennsylvania law, which the parties agree applies here, a plaintiff must allege that the defendant has conveyed "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." Boro

Constr., Inc. v. Ridley Sch. Dist., 992 A.2d 208, 217 (Pa. Commw. Ct. 2010) (quoting 2401 Pennsylvania Ave. Corp. v. Fed'n of Jewish Agencies, 489 A.2d 733, 736 (Pa. 1985)); see also Edwards v. Wyatt, 335 F.3d 261, 272 (3d Cir. 2003) (same) (quoting 2401 Pennsylvania Ave. Corp., 489 A.2d at 737). "A statement by a party that he will not or cannot perform in accordance with an agreement creates such a breach." Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 503 (E.D. Pa. 2008) (citing Oak Ridge Constr. Co. v. Tolley, 504 A.2d 1343, 1346 (Pa. Super. Ct. 1985)).

The proposed SAC alleges that "Defendant's intention to declare the Policy lapsed as many as fifteen years before the 2024 End Date constitutes an unequivocal refusal to perform its obligations under the contract, namely to pay the benefits of the Policy to the Trust upon the death of Lous [sic] and Patricia Oswald before August 15, 2042." (SAC ¶ 85.)  It further alleges "upon information and belief" that, "Defendant has, in the alternative, made a distinct and affirmative statement of its inability to perform under the contract, namely to pay the benefits of the Policy upon the death of Louis and Patrica Oswald before August 15, 2042." (Id. ¶ 86.)

As Defendant observes, however, at no point in the SAC do Plaintiffs allege that Defendant has stated that it will not—or cannot—pay the benefits of the Policy upon the death of Louis and Patricia Oswald.  Rather, the SAC only alleges that Defendant's August 2025 Illustrations and projections reflect that termination of the Policy benefits "may" occur before August 15, 2042 (SAC ¶ 61), and that the Guaranteed Assumptions that Defendant provided to them "suggest that the Policy **could** lapse as early as *2027*" (SAC ¶ 62 (first emphasis added)).  Accordingly, the SAC simply does not plausibly allege that Defendant has absolutely refused—or declared an inability— to pay benefits under the Policy upon the death of Louis and Patricia Oswald.  Thus, we find that

11

the claim of anticipatory breach that is articulated in the SAC fails to state a claim upon which relief can be granted, and it would be futile to allow Plaintiffs to amend to assert that claim.

Plaintiffs suggest in their Reply Memorandum that, in spite of how they frame their claim in the SAC, it is not based on Defendant's alleged refusal to pay death benefits due under the Policy, but is actually grounded on Defendant's alleged refusal to keep the Policy in effect through August 14, 2042, without the payment of further premiums. (See Pls.' Reply Mem. at 21 (asserting that Defendant's statement that the Policy will not survive until 2042 without further payments "is a direct repudiation of [Flank's] promise to Mr. Oswald in 1997, and again in 2013, that the investment returns on the accumulated value would be sufficient to keep the life insurance in force until 2042, and rises to anticipatory breach of contract").) They do not suggest, however, that Defendant's purported obligation to keep the Policy in effect until 2042 arises out of the Policy itself but, rather, argue that it arises out of Flank's *fraudulent* representations to them in 1997 and 2013. (See Pls.' Reply Mem. at 20 ("Defendant continued its fraud through 2013, when Mr. Flank told Mr. Oswald that he could safely cease making premium payments and that the life insurance would be self-funded through 2042.").) We therefore conclude that even if we consider this new theory of anticipatory breach of contract that Plaintiffs have articulated for the first time in their Reply Memorandum, that theory fails to state a claim upon which relief can be granted because it is not, in fact, a contractual claim but is a tort claim sounding in fraud. We thus conclude that under either theory that Plaintiffs have now put forth as the basis for their anticipatory breach of contract claim, allowing amendment to add that claim would be futile. Accordingly, we deny Plaintiffs' Motion insofar as it seeks leave to add this claim in the SAC.

12

### 2. Tort and UTPCPL Claims

### i. Principal-Agent Relationship

Defendant argues that all of Plaintiffs' tort claims (fraud, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation) as well as their UTPCPL claim are futile because they are premised on Flank's statements, and the SAC does not plausibly allege that Flank and Defendant had a principal-agent relationship, such that Defendant can be vicariously liable for his conduct.

In Pennsylvania, "[a]n agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel." Walton v. Johnson, 66 A.3d 782, 786 (Pa. Super. Ct. 2013). "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." Id. (citation omitted). "Implied authority exists in situations where the agent's actions are 'proper, usual and necessary' to carry out express agency." Id. (quoting Passarelli v. Shields, 156 A.2d 343, 347 (Pa. Super. Ct. 1959)). "Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act." Id. (citation omitted). And, finally, "[a]uthority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal." Id. (citation omitted).

In asserting a claim for vicarious liability based on agency, "a plaintiff must allege facts sufficient to make it plausible the primary wrongdoer was the defendant's agent." Migliore by Migliore v. Vision Solar LLC, 160 F.4th 79, 87 (3d Cir. 2025) (citations omitted). Notably, in the insurance world, it is usual that "an insurance agent is employed by an insurance company and represents the insurer's interests." Fisher v. Aetna Life Ins. & Annuity Co., 39 F. Supp. 2d 508,

514 (M.D. Pa. 1998) (quotation omitted), aff'd, 176 F.3d 472 (3d Cir. 1999); see also In re Asousa P'ship, Civ. A. No. 05-5719, 2006 WL 2828890, at *4 n.4 (E.D. Pa. Sept. 29, 2006) (stating that an insurance "agent is a person authorized to solicit insurance and negotiate policies on behalf of any insurer").  Ultimately, however, "a jury [ordinarily] decides whether a principal-agent relationship exists within a set of facts." Atl. Cas. Ins. Co. v. Zymblosky, No. 1167 MDA 2016, 2017 WL 3017728, at *22 (Pa. Super. Ct. July 17, 2017)

Here, the proposed SAC alleges, inter alia, that Flank "was duly authorized as Defendant's agent to sell insurance and make promises and representations on Defendant's behalf in the course of selling insurance" and that he was "financially incentivized by Defendant to sell the Policy to Plaintiffs" as either Defendant's employee or an independent contractor. (SAC ¶¶ 5, 11, 94.)  The SAC further alleges that "Defendant held out its agent and producer, Mr. Flank, . . . as a highly skilled insurance expert, possessing special knowledge and expertise needed to interpret and explain to Plaintiffs . . . the complicated and sophisticated terms of [Defendant's] policies . . . ." (Id. ¶ 94.)  In addition, the SAC alleges that "[a]t the time of [the Policy's] sale and in the years following the sale, when Mr. Flank remained the acting agent on the Policy and Plaintiffs' only contact with Defendant, Mr. Flank was a duly authorized agent acting on Defendant's behalf." (Id. ¶ 10.)

While Plaintiffs maintain that these allegations and others have sufficiently alleged express authority, they also argue that they have sufficiently alleged apparent or implied authority based on the alleged course of conduct, because "as a practical matter, . . . Defendant could not have sold Plaintiffs the written life insurance terms that it now alleges controls every issue in this litigation" if Defendant had not "authoriz[ed] Mr. Flank to sell insurance on its behalf." (Pls.' Reply Br. at 22-23.)  They further argue that their allegations that Defendants accepted sixteen years of

14

premium payments and sent Plaintiffs annual statements support reasonable conclusions that Defendant has acknowledged Flank's implied or apparent authority and has also failed to take reasonable steps to disavow Plaintiffs of their belief that Flank was acting on Defendant's behalf, such that Plaintiffs have adequately alleged agency by estoppel.  (See SAC ¶¶ 16-17, 21, 28.)

Defendant argues that the SAC contains only "legal conclusion[s] couched as . . . factual allegation[s],'" Host Int'l, Inc. 32 F.4th at 248 (quotation omitted), and that Plaintiff has failed to sufficiently allege that Defendant had the right to control Flank.  However, at this early stage of the proceedings, we conclude that the SAC's factual allegations concerning the course of conduct between Flank and Plaintiffs, including Plaintiffs' procurement of the Policy through Flank and Flank's continued counseling of Plaintiffs regarding the Policy's terms, are sufficient to support a reasonable expectation that discovery will reveal that Flank was Defendant's agent.  See Martinez, 986 F.3d at 266 (quoting Fowler, 578 F.3d at 213).  We therefore conclude that the allegations raise Plaintiffs' right to relief above a speculative level, Geness, 974 F.3d at 269, and we decline to find that amendment to add Plaintiffs' tort and UTPCPL claims would be futile based on a failure to sufficiently allege a principal-agent relationship between Defendant and Flank.

### ii.    The Alleged Misrepresentations

In Plaintiffs' fraud, fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation claims, Plaintiffs allege that Flank made two false representations.  The first was at the time of the sale in 1997 (the "1997 Statement"), when Flank represented to Plaintiffs that:

> Plaintiffs would need to make premium payments for a limited number of years, until such time that the paid-in premiums accrued enough interest such that the Accumulated Value of the Policy and additional interest would pay the annual premiums through the Policy End Date, August 15, 2042; at such time Plaintiffs would no longer need to make out-of-pocket payments in order to ensure the Policy remained in force until the End Date of August 15, 2042.

(SAC ¶ 90; see also ¶¶ 106, 121, 135.)  The second alleged misrepresentation was in July of 2013 (the "2013 Statement"), when Flank told Plaintiffs "that the Policy was paid up, that Mr. Oswald could safely cease making premium payments, and that the future premium payments would be paid out of the accrued interest on the Policy value, until the End Date of 2042."  (Id. ¶¶ 99, 115, 130, 144; see also id. ¶ 91 (alleging that in 2013, Flank told Plaintiffs that "the investments on Plaintiffs' out of pocket premium payments would yield sufficiently high returns, that the accumulated value of the Policy would cover all future premium payments owed on the Policy to the End Date of August 15, 2042")).

a.    Truthfulness of 1997 Statement

Defendant first argues that Plaintiffs cannot allege facially plausible tort claims insofar as those claims are grounded on Flank's 1997 Statement because that statement, as alleged in the SAC, was not false.  Specifically, Defendant asserts that the 1997 Statement is entirely consistent with the Policy's terms, which specifically state that the Policy will remain in force as long as the Accumulated Value of the Policy is sufficient to cover the charges on the Policy and, thus, anticipates the very scenario that Mr. Flank envisioned and described to Plaintiffs in 1997.[3]  (See Docket No. 36-1 at 19 of 27.)  Defendant emphasizes that, while the SAC alleges that Flank told Plaintiffs in 1997 that they would be able to stop paying premiums at some point in the future

---

[3]  We may consider the Policy because Plaintiffs' claims rely upon it and Defendant has authenticated it by submitting a declaration as to its authenticity.  Alpizar-Fallas, 908 F.3d at 914 (quotation omitted); (Decl. of Deidre Beckley, attached as Ex. 1 to Def.'s Mem.).
Specifically, the Policy states, in pertinent part, that:
> In the event the owner stops paying premiums, the policy will remain in force subject to [a] Grace Period and Lapse provision until the Accumulated Value, less policy debt, is no longer sufficient to cover the Administrative Charges, Insurance Charges, Rider charges, Mortality Charges, Benefit Charges, and loan interest accrued to the end of the policy month.

(See Docket No. 36-1 at 19 of 27.)

without affecting their coverage, it does not allege that he also told them in 1997 the precise number of years that they would have to pay premiums or specified the amount that would need to be paid into the Policy in order for it to be self-funding through 2042. Thus, Defendant argues, the SAC does not allege facts from which a reasonable inference can be drawn that the 1997 Statement was false.

In response to this argument, Plaintiffs do not point to allegations in the SAC that give rise to a reasonable inference that the statement was false. Instead, they simply argue that the truth or falsity of the statement is an issue of fact reserved for the jury. However, in assessing futility, we consider whether the complaint alleges facts that give rise to a plausible claim. See Warren Gen. Hosp., 643 F.3d at 84 (quotation omitted). In the absence of allegations that support a reasonable inference that Plaintiffs could not, in fact, pay some amount of sufficient premiums over a limited number of years that they would no longer need to pay any more to keep the Policy in effect until the Policy end date, the SAC simply does not plausibly allege the falsity of the 1997 Statement. Accordingly, to the extent that Plaintiffs' tort claims rest on an assertion that the 1997 Statement itself was a misrepresentation, we find that their claims are futile and thus, deny leave to amend to assert such claims.[4] We therefore dismiss Plaintiffs' fraud and misrepresentation claims insofar as they are grounded on the assertion that the 1997 Statement was false.

---

[4] Tellingly, in responding to Defendant's argument regarding Flank's 1997 Statement, Plaintiffs rely on the case of Tran v. Metropolitan Life Insurance Company, 408 F.3d 130 (3rd Cir. 2008), a case in which the court allowed tort claims based on a similar type of misrepresentation to survive summary judgment. However, in Tran, the plaintiff testified that that the insurance agent who sold him a life insurance policy specifically stated, falsely, at the time of the sale, that he would only have to pay premiums for ten years. Id. at 132-33; see also In re General Am. Life Ins. Co. Sales Practice Litig., 391 F.9d 907, 909-11 (8th Cir. 2004) (applying Pennsylvania law and considering statements to several insureds at time of life insurance sales that premiums would only have to be paid for one, ten, fourteen, twenty, or twenty-seven years). Accordingly, Tran is factually distinguishable from the instant case and does not support a conclusion that Flank's more

b.    Gist of the Action/Economic Loss Doctrine

Defendant argues that amending the Complaint to add the fraud and misrepresentation claims would be futile insofar as those claims rely on Flank's 2013 Statement because any claims based on that statement are barred by the gist of the action doctrine and/or the economic loss doctrine.  Under the gist of the action doctrine in Pennsylvania,

> [a]n alleged tort claim against a party to a contract, based on the party's actions undertaken in the course of carrying out a contractual agreement, is barred when the gist or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations.

Bruno v. Erie Ins. Co., 106 A.3d 48, 53 (Pa. 2014) (footnotes omitted).  "If, however, the facts establish that the claim involves a defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort" and is not barred.  Id. at 68 (citations omitted).  Meanwhile, in a similar vein,[5] the economic loss doctrine only "preclude[s] actions where the duty arises under a contract between the parties" rather than a societal duty.  Gernhart v. Specialized Loan Servicing LLC, Civ. A. No. 18-2296, 2019 WL 1255053, at *4 (E.D. Pa. Mar. 18, 2019); see also id. (stating that, under the economic loss doctrine, it is "[o]nly where the duty arises independently of any contractual duties between the parties" that a "breach of that duty support[s] a tort action").

---

general statement in 1997, which was not inconsistent with the Policy, was a misrepresentation supportive of a tort claim.

    [5] "[T]he gist of the action doctrines and economic loss doctrines are in many respects coextensive in Pennsylvania."  Rosenberg v. Nassau Life & Annuity Co., Civ. A No. 21-2673, 2022 WL 2718607, at *9 n.7 (E.D. Pa. July 13, 2022) (citations omitted).  This is because "[b]oth doctrines serve to maintain the conceptual distinction between breach of contract claims and tort claims, and under Pennsylvania law, the economic loss doctrine has effectively subsumed the gist of the action doctrine."  Rohrback v. NVR, Inc., 545 F. Supp. 3d 237, 242 (E.D. Pa. 2021) (quotation and citations omitted).

18

Defendant argues that, under these two doctrines, Plaintiffs' tort claims grounded on Flank's 2013 Statement that the Policy was "paid up" are futile because the obligation to pay premiums is a contractual obligation and does not arise independently of the contractual duties. In a slight twist on that same argument, it asserts that Flank's statement regarding Plaintiffs' continued duty to pay premiums is interwoven with the terms of the Policy and thus, is wholly dependent upon the terms of the Policy.

We are not convinced, however, that Plaintiffs' tort claims are not based on a societal duty that is materially divorced from the contractual terms. In Tran v. Metropolitan Life Insurance Company, 408 F.3d 130 (3rd Cir. 2008), the United States Court of Appeals for the Third Circuit recognized that a tort claim can exist notwithstanding the terms of a policy when an insurance agent misrepresents the terms of the policy. Id. at 134, 139 (considering tort claims that an insurance agent fraudulently misrepresented terms of policy and holding that insured may justifiably rely on such representations). As the court explained, Pennsylvania law provides that "where an insurer or its agent creates in the insured a reasonable expectation of coverage that is not supported by the terms of the policy[,] that expectation will prevail over the language of the policy." Id. at 136 (quoting Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994)). This is what we understand the SAC's tort claims to allege, i.e., that Flank made Plaintiffs false promises that were not reflected in the Policy terms and thereby violated a broader societal duty not to defraud or mislead. (See, e.g., SAC ¶ 96 (alleging that Flank "made false. . . representations . . . regarding the Policy and its End Date, Plaintiffs' limited obligation to pay premiums [and] that the Policy would be self-funded based on Accumulated Value in 2013")). See also Norfolk S. Ry. Co. v. Pittsburgh & W.V. R.R., 153 F. Supp. 3d 778, 815 (recognizing a "broader social duty . . . to refrain from defrauding"); Telwell Inc. v. Grandbridge Real Estate

19

Capital LLC, 143 A.3d 421, 429 (Pa. Super. Ct. 2016) (recognizing a "societal duty not to affirmatively mislead" (quoting Bruno, 106 A.3d at 58)).

We therefore conclude that the gist of the action doctrine and the economic loss doctrine do not clearly render Plaintiff's tort claims futile at this early pleadings stage. Accordingly, we reject Defendant's argument to the contrary.

### iii.   Actual Harm

Defendant argues that amendment of the Complaint to add any of Plaintiffs' tort-based theories of recovery would be futile because the proposed SAC fails to allege actual harm, an essential element of fraud and negligence claims under Pennsylvania common law.

In Pennsylvania, the elements of fraud and fraudulent misrepresentation are:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (citation omitted); see also Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009) (same) (quotation omitted). The elements of a claim for negligent misrepresentation under Pennsylvania law are:

> (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

Bilt–Rite Contractors. Inc. v. The Architectural Studio, 866 A.2d 270, 277 (Pa. 2005) (quoting Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999)). Thus, all such fraud and negligence claims require plaintiffs to establish that they have been injured as the result of justifiable reliance upon an alleged

20

misrepresentation.  Gibbs, 647 A.2d at 890 (fraud); Gregg v. Ameriprise Fin. Inc., 245 A.3d 637, 645-46 (Pa. 2021) (fraudulent and negligent misrepresentation) (citing Bortz, 729 A.2d at 560).

In the SAC, Plaintiffs allege that they are "in jeopardy of having Defendant declare their Policy to be lapsed or of being required . . . to pay exponentially greater and unreasonable premiums to keep the Policy in force until the 2042 End Date," and that they have therefore "been harmed as a direct, proximate result of Defendant's and its agent and producer Mr. Flank's misrepresentations and Plaintiffs' justifiable reliance thereon." (SAC ¶¶ 102, 118, 133, 148, 164.) Defendant argues that the "alleged 'jeopardy' of hypothetical future harm is not the kind of actionable injury" that can support Plaintiffs' common law tort claims. (Def.'s Mem. at 29.)

We conclude, however, that the SAC plausibly alleges actual harm insofar as it alleges that the Policy will not cover Plaintiffs until 2042 without further payments even though Flank told them in 2013 that no further payments were necessary.  This conclusion finds support in the case of West Chester University Foundation v. MetLife Insurance Co., 259 F. Supp. 3d 211 (E.D. Pa. 2017) ("WCUF"), in which the court found that a plaintiff had adequately pled actual harm, where the complaint alleged that, contrary to representations made by an insurance agent when the plaintiff purchased life insurance policies, "[t]he annual premiums never vanished and as such, the Policies will lapse unless Plaintiff continues to pay the annual premium for each [policy]." Id. at 215, 218.  Defendant seeks to distinguish WCUF from this case, based on the allegation in WCUF that the insurer in that case had induced the plaintiff to purchase life insurance by promising that only six annual premium payments would be due before the policies were self-sufficient. See id. at 214.  Defendant argues that, in that scenario, "harm could be established as soon as a seventh additional payment was necessary to keep the policies in force." (Def.'s Sur-Reply Mem. at 12-13.)  Here, it maintains, "Plaintiffs cannot have suffered harm as a result of their reliance on Mr.

21

Flank's alleged sales pitch [in 1997] because, without a specific promise as to when the Policy would be self-sufficient, they cannot have been required to pay more premiums than promised at the time of sale to keep the Policy in force." (Id. at 13.)

We have already concluded, however, that the misrepresentation that grounds the Plaintiffs' tort claims cannot be the true 1997 Statement, which did not set forth the specific number of payments that Plaintiffs needed to make to keep the Policy in force until 2042 but, rather, is the 2013 Statement, which was that the payments that Plaintiffs had made up to that date were sufficient to keep the Policy in force until 2042. We conclude that the SAC sufficiently alleges that Plaintiffs suffered actual harm as a result of their reliance on the 2013 Statement because, construing the factual allegations in the light most favorable to Plaintiffs, see Talley, 116 F.4th at 206 (citation omitted), the SAC alleges that Defendant has advised Plaintiffs that the Policy will lapse well before 2042 unless the Plaintiffs make additional substantial premium payments. In that regard, this case is not materially distinguishable from WCUF, in which the plaintiff was also warned that its policies would lapse if additional payment were not made. Thus, like the WCUF court, we conclude that Plaintiffs have sufficiently alleged harm resulting from their reliance on the 2013 Statement, i.e., that they have not received the full coverage they were promised and are being told they need to pay more to maintain it. We therefore reject Defendant's argument that allowing Plaintiffs to amend the Complaint to add the tort claims would be futile because the SAC fails to plausibly allege actual harm.

### iv.  Fraud: Materiality and "Information and Belief" Pleading

Defendant next argues that we should deny Plaintiffs' request to amend the Complaint to add claims of fraud, fraudulent inducement, and fraudulent misrepresentation because the SAC fails to sufficiently allege certain elements of those claims with the requisite particularity. See

Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularly the circumstances constituting fraud and mistake.")  Its arguments are twofold: (1) that the SAC fails to allege facts demonstrating that Flank's alleged misstatements to Plaintiffs were material, and (2) that amendment to add these claims would be futile because the SAC alleges facts based on "information and belief." [6]

Specifically with respect to the former argument, Defendant asserts that Plaintiffs' allegations of materiality in Paragraphs 108 and 116 of the SAC are conclusory and therefore fail to meet the Rule 9(b) pleading standard.  However, considering the SAC as a whole and drawing all inferences in Plaintiffs' favor, we conclude that the SAC's allegations that Flank's misstatements caused Plaintiffs to stop paying premiums on the Policy in 2013, which, in turn, led to the current threat that the Policy will lapse in the absence of additional, significant premium payments, are sufficiently particular at this stage to satisfy Rule 9(b) and plausibly allege that Flank's alleged misrepresentation in 2013 was material.  (See, e.g., SAC ¶ 131 (stating that Flank's 2013 Statement "was material to the contract" because "had Mr. Oswald been properly informed by Defendant that ceasing premium payments in 2013 carried a risk of the policy lapsing 15 years before the contractual End Date of August 15, 2042," Mr. Oswald would not have acted on Flank's advice); id. ¶ 133 (alleging that Plaintiffs are "now in jeopardy of having Defendant declare their Policy to be lapsed or of being required . . . to pay exponentially greater and unreasonable premiums to keep the Policy in force until the 2042 End Date").)  We thus reject Defendant's

---

[6]  In addition to these two arguments, Defendant repeats its arguments, developed earlier in its Memorandum of Law, that the SAC fails to adequately allege a principal-agent relationship between Flank and Defendant, that the 1997 statement was not false, that the claims based on the 2013 statement are barred by the gist of the action and economic loss doctrines, and that Plaintiffs cannot establish actual harm.  As we have already addressed and resolved these arguments, we do not address them again here.

argument that amendment to add the fraud claims would be futile because the SAC does not include sufficient allegations concerning materiality.

In its second argument, Defendant asserts that the SAC alleges facts based on "information and belief" and contends that such pleading of fraud claims is only permissible if "the information needed to plead with more particularity is in the defendant's exclusive custody and control" and the plaintiff "'sets forth specific facts upon which the belief is reasonably based.'"  (Def.'s Mem. at 31-32 (quoting In re Processed Egg Prods. Antitrust Litig., 851 F. Supp 2d 867, 880 (E.D. Pa. 2012)).)  Defendant points to several "information and belief" allegations in the SAC's fraud counts and asserts that those allegations are insufficient to state claims because they are neither accompanied by allegations that they concern matters exclusively within Defendant's control nor supported by specific factual allegations.  (Id. (citing SAC ¶¶ 89, 91, 96-98, 105, 107, 112-114, 120, 122, 127-129).)[7]  However, many of the identified allegations, on their face, concern matters within Defendant's (including Flank's) exclusive control, e.g., that "Flank relied on Defendant's investment return projections and projections of costs" at the time of the sale and that "Defendant had no intention of adhering to those representations" (SAC ¶¶ 89, 105, 120); that Flank made his false promises "with full knowledge of the deceptive sales tactics used in the industry," "with reckless indifferen[ce] to the truth," "knowing that Plaintiffs were unsophisticated purchasers," and "with the intent of inducing Plaintiffs to purchase the Policy" (id. ¶¶ 96-97, 112-113, 127-28); and that Flank knew that but for his use of deceptive sales practices and misrepresentations, "Plaintiffs would not have purchased the Policy" (id. ¶¶ 98, 114, 129).  Moreover, Defendant simply asserts, without any elaboration, that "Plaintiffs have not provided a specific factual basis

---

[7] Defendant cites to additional paragraphs that do not include the phrase "information and belief."  Accordingly, we do not list them here.

24

for any of their information and belief pleadings as to Defendant's alleged misrepresentations." (Def.'s Mem. at 32.)  In the absence of a more specific argument as to what elements of the fraud claims are not adequately alleged due to the "information  and belief" pleading, and considering the full context of the allegations about which Defendant complains, we are not prepared to find that the "information and belief" allegations are inadequate to support the fraud claims at this time. We thus reject Defendant's "information and belief" argument and will not deny Plaintiffs leave to assert fraud claims on that basis.

### v.    UTPCPL

Defendant next argues that allowing Plaintiffs to add the UTPCPL claim would be futile. "The purpose of the UTPCPL is 'to prevent and deter fraud.'"  Sunshine v. Reassure Am. Life Ins. Co., 515 F. App'x 140, 144 (3d Cir. 2013) (quoting Agliori v. Metro. Life Ins. Co., 879 A.2d 315, 320 (Pa. Super. Ct. 2005)).  To that end, the statute prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," 73 Pa. Stat. Ann. § 201-3(a), and defines trade and commerce to mean "the advertising, offering for sale, sale or distribution of . . . services and . . . property," id. § 201-2 (3).  It creates a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property . . . as a result of the use or employment by any person of a method, act or practice" that the statute declares unlawful. Id. § 201-9.2(a).

Here, the SAC alleges that the sale of the Policy "is within the purview of the [UTPCPL]" and that both the 1997 Statement and the 2013 Statement constituted unfair or deceptive acts under the statute.  (SAC ¶ 150; see also id. ¶¶ 152-153, 161.)  Specifically, the SAC asserts that the 1997 and 2013 Statements violated the UTPCPL's prohibition of the following:  (1) "[r]epresenting that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have," 73 Pa. Cons.

25

Stat. § 201-2(4)(v); (2) "[r]epresenting that goods or services are of a particular standard, quality or grade, or that the goods are of a particular style or model, if they are of another," id. § 201-2(4)(vii); (3) "[a]dvertising goods or services with intent not to sell them as advertised," id. § 201-2(4)(ix); (4) "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer, prior to or after a contract for the purchase of goods or services is made," id. § 201-2(4)(xiv); and (5) "[e]ngaging in any other fraudulent or deceptive conduct with creates a likelihood of confusion or of misunderstanding," id. § 201-2(4)(xxi).  (SAC ¶ 166.)  The SAC asserts that Plaintiffs have and will continue to suffer harm on account of these violations insofar as they are being required to pay significant unreasonable premiums to keep their Policy from lapsing.  (Id. ¶¶ 164-65.)

Defendant argues that adding the UTPCPL claim would be futile because the law provides that the statute is only applicable to conduct that precedes the formation of an insurance contract, and the SAC does not plausibly allege that the only pre-contractual statement in the case, i.e., the 1997 Statement, was either a misrepresentation or the cause of any ascertainable loss.  (See Def.'s Mem. at 34 (citing Kelly v. Progressive Advanced Ins. Co., 150 F. Supp. 3d 564-65 (E.D. Pa. 2016)).)  Defendant has not, however, cited binding legal authority for its underlying premise that only pre-contractual conduct can give rise to a UTPCPL claim involving an insurance policy. Multiple decisions in this court, the Third Circuit, and the Pennsylvania state courts have stated that, while the UTPCPL does not apply to the handling of insurance claims, it does apply to "malfeasance, the improper performance of a contractual obligation." Fulciniti v. State Farm Fire & Cas. Co., Civ. A. No. 23-1349, 2023 WL 4763996, at *3 (E.D. Pa. July 26, 2023) (quoting Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 564-65 (3d Cir. 2008)); see also, e.g., Ellis v. Liberty Mut. Ins. Co., Civ. A. No. 18-1032, 2018 WL 3594987, at *3 (E.D. Pa. July 26, 2018)

26

(same) (quoting <u>Gardner</u>, 544 F.3d at 564-65) (citation omitted); <u>Winner v. Progressive Advanced Ins. Co.</u>, 345 A.3d 750, 758-59 (Pa. Super. Ct. 2025) (finding trial court's dismissal of UTCPL claim in error when complaint did not allege that insurance claim was mishandled, but plausibly alleged that insurance adjuster engaged in other misconduct that the trial court characterized as potential malfeasance); <u>Gordon v. Pa. Blue Shield</u>, 548 A.2d 600, 604 (Pa. Super. Ct. 1988) (noting that "'misfeasance' might bring [a] claim within the purview of the [UTPCPL]"). Accordingly, Defendant's assertion that the UTPCPL applies only to pre-contractual actions is inaccurate and, by relying on it, Defendant has improperly restricted its futility argument to the plausibility of a statutory claim arising out of the 1997 Statement, without consideration of the 2013 Statement. We thus conclude that Defendant has failed to establish that amendment of the Complaint to add the UTPCPL claim would be futile, and we grant Plaintiffs leave to assert their UTPCPL claim.

### 3.    42 Pa. Cons. Stat. § 8371

Finally, Defendant argues that amendment of the Complaint to add Plaintiff's bad faith claim pursuant to 42 Pa. Cons. Stat. § 8371 would be futile. In order to succeed on a claim of bad faith pursuant to § 8371, the plaintiff must ordinarily "demonstrate that the insurer (1) lacked a reasonable basis for denying benefits and (2) knew or recklessly disregarded its lack of a reasonable basis." <u>Atiyeh v. Nat'l Fire Ins. Co.</u>, 742 F. Supp. 2d 591, 598 (E.D. Pa. 2010) (citing <u>Toy v. Metro. Life Ins. Co.</u>, 928 A.2d 186, 193 (Pa. 2007)) (additional citation omitted). However, "[S]ection 8371 is not restricted to an insurer's bad faith in denying a claim." <u>Greene v. United Servs. Auto. Ass'n</u>, 936 A.2d 1178, 1187 (Pa. Super. Ct. 2007) (alteration in original) (quoting <u>Condio v. Erie Ins. Exch.</u>, 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006)); <u>see also</u> <u>UPMC Health Sys. v. Metro. Life Ins. Co.</u>, 391 F.3d 497, 506 (3d Cir. 2004) (stating that "the alleged bad faith need not be limited to the literal act of denying a claim" (citation omitted)). Rather, an action for

bad faith can arise from "wide variety of objectionable conduct," including "'lack of good faith investigation into facts, and failure to communicate with the claimant.'" Greene, 936 A.2d at 1188 (quoting Condio, 899 A.2d at 1142). Indeed, "courts applying Pennsylvania law have extended bad faith beyond mere denial of claims, [recognizing other] bad faith claims related to specific conduct of the insurer following issuance of a policy." Kirschner v. State Farm Fire & Cas. Co., Civ. A. No. 23-993, 2023 WL 7167568, at *3 (E.D. Pa. Oct. 31, 2023) (citing Mitch's Auto Serv. Ctr., Inc. v. State Auto. Mut. Ins. Co., Civ. A. No. 10-3413, 2011 WL 5042480, at *7 (E.D. Pa. Oct. 24, 2011)).

Here, Defendant argues that the statutory bad faith claim is futile because the SAC does not allege that Defendant denied a claim under the Policy. However, as the above law makes clear, a plaintiff can potentially state a cognizable claim under § 8371 that is not based on the denial of an insurance claim. We therefore reject Defendant's argument that to add the bad faith claim would necessarily be futile because it has not denied a claim, and we grant Plaintiffs leave to assert their bad faith claim pursuant to § 8371.

## IV.    CONCLUSION

For the foregoing reasons, we grant in part and deny in part Plaintiffs' Motion for Leave to File a Second Amended Complaint. We deny the Motion insofar as Plaintiffs seek to file a second amended complaint that asserts an anticipatory breach of contract claim and tort claims that rely on allegations that the 1997 Statement was false. We grant the Motion in all other respects. On

28

or before May 4, 2026, Plaintiffs may file their proposed SAC but must omit the anticipatory breach of contract claim as well as claims grounded on an allegation that the 1997 Statement constituted a misrepresentation.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.

29